Lisa KONKEL and Kevin Konkel,
Plaintiffs,

UNITED HEALTHCARE OF WISCONSIN, INC.,
Involuntary-Plaintiff,

v.

ACUITY, a Mutual Insurance Company
and Nancy Lynch,
Defendants-Third-Party Plaintiffs-Appellants,†

v.

MIDWEST NEUROSURGICAL ASSOCIATES, S.C.
and Dr. Arvind Ahuja, M.D.,
Third-Party Defendants-Respondents.

Court of Appeals

*No. 2008AP2156. Oral argument May 21, 2009.
—Decided August 11, 2009.*

2009 WI App 132

(Also reported in 775 N.W.2d 258.)

---

† Petition to Review denied 11/12/09. Roggensack, J., dissents.

On behalf of the defendants-third-party plaintiffs-appellants, Acuity, a mutual insurance company, and Nancy Lynch, the cause was submitted on the briefs of *Arthur P. Simpson* and *Christine M. Rice* of *Simpson & Deardorff, S.C.*, of Milwaukee, with oral argument by Arthur P. Simpson.

On behalf of the third-party defendants-respondents, the cause was submitted on the brief of *Todd M. Weir* and *Jason J. Franckowiak* of *Otjen, Van Ert & Weir, S.C.*, of Milwaukee, with oral argument by Todd M. Weir.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. CURLEY, P.J. Acuity, a Mutual Insurance Company, and its insured, Nancy Lynch (collectively referred to as Acuity unless otherwise specified) appeal from a summary judgment order dismissing their action against Midwest Neurosurgical Associates, S.C., and Arvind Ahuja, M.D. (collectively referred to as Dr. Ahuja unless otherwise specified). Acuity argues that it should be reimbursed for the expenses related to what it contends was an unnecessary surgery performed by Dr. Ahuja on Lisa Konkel.

¶ 2. At issue are the rights of an alleged tortfeasor, following *Hanson v. American Family Mutual In-*

*surance Co.*, 2006 WI 97, 294 Wis. 2d 149, 716 N.W.2d 866, to recover in subrogation against a plaintiff's health care provider for unnecessary treatment. Pursuant to *Hanson*, if a plaintiff is injured in an accident, an alleged tortfeasor must pay for damages related to the plaintiff's unnecessary surgery if he or she exercised ordinary care in selecting the surgeon. *Id.*, ¶ 27. Resolution of this appeal centers on whether the alleged tortfeasor can then seek subrogation from the health care provider for payment of damages related to the unnecessary medical treatment. We conclude that: Acuity's subrogation claim fails under WIS. STAT. ch. 655 (2007–08); "as applied" to Acuity, ch. 655 does not violate guarantees of equal protection; and public policy considerations support this determination.[1] Accordingly, we affirm.

## I. BACKGROUND.

¶ 3. This appeal arises out of a motor vehicle accident on April 28, 2005, involving vehicles operated by Konkel and Lynch. Konkel and her husband filed a personal injury lawsuit against Lynch and Acuity alleging that Lynch's negligent operation of her vehicle caused them injuries.[2] As relevant here, Konkel sought to recover damages related to a cervical decompression and arthrodesis surgery she claimed was necessitated

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted. Although the surgery at issue took place in May 2006, the current version of the statutory sections cited in this opinion are the same in all relevant respects.

[2] As her husband's claims in this matter are not an issue in this appeal, we refer to Lisa as Konkel throughout this opinion.

by injuries she sustained in the accident. Konkel's surgery was performed by Dr. Ahuja of Midwest Neurosurgical Associates, S.C.

¶ 4. Acuity filed a third-party complaint against Dr. Ahuja and Midwest Neurosurgical Associates, S.C., alleging that the surgery performed on Konkel was medically unnecessary.[3] In the event it was determined that Konkel exercised reasonable care in selecting Dr. Ahuja, but that the surgery was medically unnecessary, Acuity sought an award of indemnity from Dr. Ahuja and Midwest Neurosurgical Associates, S.C., for payment of all damages incurred because of the unnecessary surgery.

¶ 5. Dr. Ahuja moved for summary judgment, arguing: (1) that Acuity lacked standing to bring a medical malpractice action against a health care provider in Wisconsin; (2) that Acuity's third-party claim was at odds with the purpose behind Wis. Stat. ch. 655; and (3) that Acuity's third-party claim was barred on public policy grounds because it creates an inappropriate burden upon the physician-patient relationship. Dr. Ahuja has consistently denied that he was negligent in his treatment of Konkel, and in support of his summary judgment motion, Konkel provided an affidavit stating that she has "no complaints concerning the care and treatment Dr. Ahuja . . . provided [her], and continues to provide [her], as [her] treating neurosurgeon."[4]

¶ 6. Acuity subsequently filed an amended third-party complaint adding a subrogation claim. Acuity

---

[3] Technically, Acuity named Midwest Neurosciences Associates, LLC, as a third-party defendant. It was later determined that Midwest Neurosurgical Associates, S.C., was the proper entity.

[4] There has been no finding that Dr. Ahuja committed malpractice.

asserted that it was both subrogated to the rights of Konkel and entitled to indemnity from Dr. Ahuja in the event it was determined that Konkel exercised reasonable care in selecting Dr. Ahuja, but that the surgery was medically unnecessary. Specifically, Acuity sought to recover "all damages [it] incur[s] because of the unnecessary medical surgery, including the charges for the surgery and all care related to the surgery, as well as any pain and suffering awarded by a jury because of the surgical procedure." In opposing Dr. Ahuja's summary judgment motion, Acuity submitted two expert reports concluding that the surgery performed by Dr. Ahuja was medically unnecessary. Prior to when Dr. Ahuja's answer to the amended third-party complaint was due, the trial court granted his summary judgment motion. Acuity now appeals.

## II. ANALYSIS.

*A. Standards of Review.*

¶ 7. We review *de novo* a trial court's rulings on summary judgment and apply the governing standards "just as the trial court applied those standards." *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment must be granted when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2). A party that has the burden of proof at trial in connection with a claim has the burden to show that there are genuine issues of material fact that require a trial on that claim. *Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 290, 507 N.W.2d 136 (Ct. App. 1993).

¶ 8. This appeal involves the interpretation and application of various statutory provisions found within WIS. STAT. ch. 655. Because statutory interpretation presents questions of law, our review is *de novo*. *Lornson v. Siddiqui*, 2007 WI 92, ¶ 14, 302 Wis. 2d 519, 735 N.W.2d 55. We begin with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. That language is given its common, ordinary, and accepted meaning. *Id.* We interpret language in the context in which it is used, in relation to the language of surrounding or closely related statutes, and in a way that avoids absurd results. *Id.*, ¶ 46. We also consider the purpose of the statute so far as the purpose is shown in the text and structure of the statute. *Id.*, ¶ 48.

¶ 9. As part of our analysis, we will address whether the application of WIS. STAT. ch. 655 to Acuity's claim violates equal protection guarantees. "The constitutionality of a statute is a question of law we review without deference to the [trial] court." *State v. Quintana*, 2007 WI App 29, ¶ 19, 299 Wis. 2d 234, 729 N.W.2d 776. Similarly, whether public policy considerations preclude liability is a question of law subject to our independent determination. *Gould v. American Family Mut. Ins. Co.*, 198 Wis. 2d 450, 461, 543 N.W.2d 282 (1996).

B. *WISCONSIN STAT. ch. 655 precludes Acuity's claim against Dr. Ahuja.*

¶ 10. As an initial matter, we note that based on the record before us, Acuity has abandoned its claim for

indemnification, and instead pursues only its subrogation claim. *See Reiman Assocs., Inc. v. R/A Adver., Inc.*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292 (Ct. App. 1981) (issues not briefed are deemed abandoned). To assert a valid subrogation claim, Acuity was required to make a payment to Konkel, and there is no evidence of payment in the appellate record.[5] *See Muchow v. Goding*, 198 Wis. 2d 609, 626, 544 N.W.2d 218 (Ct. App. 1995) ("Payment is the *sine qua non* for subrogation."). Citing Wis. Stat. § 803.05(1), however, Acuity argues that Wisconsin law supports contingent third-party claims such as the one it asserts in this matter. Because we address the issues raised by Acuity as if it had made the requisite payment to support a valid subrogation claim, we need not resolve whether § 803.05 allows Acuity to circumvent the payment requirement. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to decide nondispositive issues).[6]

---

[5] After the filing of the appeal in this case, the Konkels settled their claims against Acuity and Lynch; however, we did not allow Acuity to supplement the record with the release. In the event we deemed actual payment to be a prerequisite to its subrogation claim, Acuity sought a remand to the trial court so that a finding can be made that there has been a payment. Presumably, once such a finding is made, Acuity will appeal raising the same issues that are presently before us. Consequently, we conclude that the posture of this case and the interests of judicial economy compel us to address the merits of the issues raised.

[6] Due to the timing of the summary judgment order dismissing Acuity's case, Dr. Ahuja did not file an answer to Acuity's amended third-party complaint raising any defense related to Acuity's subrogation claim or asserting that Acuity failed to state a claim upon which relief can be granted. As such, it appears that the trial court never considered whether proof of payment was required for Acuity to bring its claim against Dr. Ahuja.

315

## 1. Acuity's subrogation claim is no longer valid.

¶ 11. Acuity contends that its subrogation claim in this matter has been recognized by the common law and that it is not abolished by WIS. STAT. ch. 655. As such, Acuity contends that it has the right to "stand in the shoes" of Konkel and seek reimbursement for her allegedly unnecessary care. *See Wilmot v. Racine County*, 136 Wis. 2d 57, 63, 400 N.W.2d 917 (1987) ("[A] subrogee is one who steps into the shoes of the subrogor to the extent it has made payment as a result of the actionable event."). In support of its position, Acuity relies exclusively on cases predating the enactment of WIS. STAT. ch. 655.[7] *See, e.g., Hartley v. St. Francis Hosp.*, 24 Wis. 2d 396, 129 N.W.2d 235 (1964), *modified by* 24 Wis. 2d 396, 130 N.W.2d 1 (1964); *Greene v. Waters*, 260 Wis. 40, 49 N.W.2d 919 (1951); *Noll v. Nugent*, 214 Wis. 204, 252 N.W. 574 (1934); *Retelle v. Sullivan*, 191 Wis. 576, 211 N.W. 756 (1927); *Fisher v. Milwaukee Elec. Ry. & Light Co.*, 173 Wis. 57, 180 N.W. 269 (1920). Acuity argues that the aforementioned cases were not affected by the enactment of ch. 655. We disagree.

¶ 12. We conclude that WIS. STAT. ch. 655 extinguished Acuity's subrogation claim. *See State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 509, 261 N.W.2d 434 (1978) ("Like the Workmen's Compensation Act, Chapter 655, Stats., was enacted in response to a perceived economic and social crisis. Like the Workmen's Compensation Act, it applies only to a limited class of injured persons. Both laws modify the

---

[7] Chapter 655 of the Wisconsin Statutes was enacted in 1975. *See* 1975 Wis. Laws, ch. 37.

common law procedures for redress of personal injuries."). The legislature is presumed to have been aware of the line of cases on which Acuity relies, *see Czapinski v. St. Francis Hosp., Inc.*, 2000 WI 80, ¶ 24, 236 Wis. 2d 316, 613 N.W.2d 120 (explaining that "the legislature is presumed to know that Wisconsin courts have established that adult children cannot recover for loss of society and companionship in medical malpractice cases"), and yet, subrogated claims of third-party non-patients such as Acuity or Lynch were not accounted for within the statutory framework of ch. 655.

¶ 13. According to Acuity, this omission supports its position insofar as there is no indication from either the notes to Wis. Stat. ch. 655 or the statutory language itself that the legislature meant to exclude a subrogation claim against a health care provider arising out of a payment for damages resulting from an unnecessary surgery. In making this argument, Acuity overlooks that ch. 655 was created in response to a "perceived crisis in Wisconsin's health care system" related to the rapidly increasing number of medical malpractice lawsuits, which in turn "were working a detriment to health care providers, patients and the public in general."[8] *Lund v. Kokemoor*, 195 Wis. 2d 727, 734–35, 537 N.W.2d 21 (Ct. App. 1995). Acuity's position, which

---

[8] The notes to Wis. Stat. ch. 655 set forth the legislative findings underpinning the chapter's enactment. The notes provide:

"Legislative findings. (1) The legislature finds that:

"(a) The number of suits and claims for damages arising from professional patient care has increased tremendously in the past several years and the size of judgments and settlements in connection therewith has increased even more substantially;

"(b) The effect of such judgments and settlements, based frequently on newly emerging legal precedents, has been to cause

317

## would allow third-party nonpatients to pursue medical malpractice actions, is at odds with the legislative

the insurance industry to uniformly and substantially increase the cost and limit the availability of professional liability insurance coverage;

"(c) These increased insurance costs are being passed on to patients in the form of higher charges for health care services and facilities;

"(d) The increased costs of providing health care services, the increased incidents of claims and suits against health care providers and the size of such claims and judgments has caused many liability insurance companies to withdraw completely from the insuring of health care providers;

"(e) The rising number of suits and claims is forcing both individual and institutional health care providers to practice defensively, to the detriment of the health care provider and the patient;

"(f) As a result of the current impact of such suits and claims, health care providers are often required, for their own protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care;

"(g) As another effect of the increase of such suits and claims and the costs thereof, health care providers are reluctant to and may decline to provide certain health care services which might be helpful, but in themselves entail some risk of patient injury;

"(h) The cost and the difficulty in obtaining insurance for health care providers discourages and has discouraged young physicians from entering into the practice of medicine in this state;

"(i) Inability to obtain, and the high cost of obtaining, such insurance has affected and is likely to further affect medical and hospital services available in this state to the detriment of patients, the public and health care providers;

"(j) Some health care providers have curtailed or ceased, or may further curtail or cease, their practices because of the nonavailability or high cost of professional liability insurance; and

"(k) It therefor appears that the entire effect of such suits and claims is working to the detriment of the health care provider, the patient and the public in general."

318

purposes for which ch. 655 was created to address.[9] *Cf. Lund*, 195 Wis. 2d at 736 ("The position the plaintiffs advance is inconsistent with the legislature's stated purpose because punitive damages would result in increased judgments and thereby increase liability insurance costs.").

¶ 14. We are not convinced that this resolution leads to a "loophole," amounting to de facto immunity for physicians who render unnecessary care, as argued by Acuity. It remains that, pursuant to WIS. STAT. § 655.007, any "patient or the patients' representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice" can pursue a claim in accordance with the exclusive procedures set forth in WIS. STAT. ch. 655.

¶ 15. Finally, Acuity contends that "the *Hanson* decision does not say that the innocent defendant is to be left 'holding the bag' without any recourse against

(Quoting 1975 Wis. Laws, ch. 37, § 1.) "These legislative findings are not binding on the court but carry great weight." *Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund*, 2005 WI 125, ¶ 87, 284 Wis. 2d 573, 701 N.W.2d 440.

[9] Acuity contends that *Lund v. Kokemoor*, 195 Wis. 2d 727, 537 N.W.2d 21 (Ct. App. 1995), is distinguishable because the plaintiffs in that case were arguing for new provider exposure whereas Acuity seeks to be subrogated to the same right against Dr. Ahuja as Konkel already has under WIS. STAT. ch. 655. Contrary to Acuity's contention, allowing subrogation claims such as the one asserted in this case would result in new liability exposure for health care providers. Specifically, in this case, it is undisputed that Konkel is satisfied with her treatment from Dr. Ahuja and is not pursuing a medical malpractice claim against him; yet, Acuity seeks to do so on her behalf. If Acuity's claim is allowed to proceed the inevitable result will be new provider exposure.

the party who made the decision to render such treatment in the first place." We are not persuaded by Acuity's argument, which as restated by Dr. Ahuja, goes like this: "that questions not presented to the *Hanson* court provide Acuity and Lynch the right to proceed, because the questions, which were not presented, were not answered." (Underling omitted; italics added.) *Hanson* does not lend any guidance on the resolution of the issues at hand and, in the absence of such guiding principles, cannot be said to support Acuity's position.

### 2. Acuity alleges that Dr. Ahuja committed medical malpractice.

¶ 16. In an effort to convince us that its claim for subrogation is outside the purview of Wis. Stat. ch. 655, Acuity asserts that its claim is not a "claim for injury or death on account of malpractice" as is required to invoke Wis. Stat. § 655.007. Instead, Acuity describes it as a claim for reimbursement of payments made to Konkel for damages resulting from Dr. Ahuja's unnecessary surgery.

¶ 17. According to Acuity, the circumstances of its claim are analogous to those of the patient's claim in *Northwest General Hospital v. Yee*, 115 Wis. 2d 59, 339 N.W.2d 583 (1983). *Yee* arose out of a contract action brought by a hospital against a patient to collect for medical services. *Id.* at 61. The patient then filed a third-party action against the physician who ordered the hospitalization that led to the debt. *Id.* There, the court made clear: "[I]f the instant case centered *solely* around the issue of unnecessary treatment, [Wis. Stat.] ch. 655 would clearly apply to [the patient]'s claim." *Yee*, 115 Wis. 2d at 62 (emphasis added). The court explained that it faced not just the issue of unnecessary treatment, but also the fact that the patient did not

320

allege bodily injury or aggravation of an existing injury due to the physician's negligence. *Id.* The *Yee* court concluded that ch. 655 was inapplicable to the patient's claim against the doctor because it arose from an action to recover fees for medical services where no bodily injury was alleged. *Yee*, 115 Wis. 2d at 67.

¶ 18. Unlike the court's conclusion in *Yee*, here, despite Acuity's admirable efforts to avoid the medical malpractice label, we conclude that its contention that Dr. Ahuja rendered unnecessary medical treatment amounts to an action for medical malpractice. *See id.* at 61–62 ("Initially, we would like to stress that this court and other jurisdictions have found unnecessary and improper treatment to constitute malpractice.") (citations omitted); *see also Deborah S.S. v. Yogesh N.G.*, 175 Wis. 2d 436, 442, 499 N.W.2d 272 (Ct. App. 1993) ("The patient correctly observes that the Wisconsin Supreme Court has held that unnecessary and improper treatment constitutes malpractice.").[10] Moreover, Acuity's assertion that it is not making a claim for "bodily injury or death on account of malpractice" seems disingenuous in light of that fact that its attorney confirmed during

[10] In one of the expert reports submitted by Acuity in opposition to Dr. Ahuja's motion for summary judgment, Ronald P. Pawl, M.D., opined that the surgery was both unnecessary and improper, stating:

In my opinion, the surgical procedure carried out by Dr. Ahuja constituted malpractice of the worst kind, since it was deliberate and without any foundation medically, and especially since he documented symptoms that he recognized would not respond to the surgery, but in no way attempted to find out the source of those symptoms.

Mrs. Konkel has no medical residuals from the motor accident in question, but does have residuals from the unnecessary surgery carried out by Dr. Ahuja.

oral argument that Acuity seeks to recover costs related to Konkel's pain and suffering—damages associated with an injury.

■■

¶ 19. Our conclusion that Acuity is asserting a medical malpractice claim governed by WIS. STAT. ch. 655 is further supported because, as articulated by Dr. Ahuja, "if the third-party claim had been brought against Dr. Ahuja by Ms. Konkel, who was Dr. Ahuja's patient, rather than by Acuity, a third-party non-patient, there would be no question that the amended third-party complaint, in fact, asserts a medical malpractice claim." (Some uppercasing omitted.) *See* WIS. STAT. § 655.006(1)(a) ("On and after July 24, 1975, every patient, every patient's representative and every health care provider shall be conclusively presumed to have accepted to be bound by this chapter."). Acuity cannot have it both ways—it wants to stand in Konkel's shoes and yet not be bound by the exclusive procedure that would govern any claim against Dr. Ahuja that she could assert. "[W]here one acquires a right by subrogation, that right is not a separate cause of action from the right held by the subrogor." *Wilmot*, 136 Wis. 2d at 63. If Acuity wants to step into Konkel's shoes, the nature of the action remains the same as if Konkel had pursued it herself. *See id.* ("[S]ubrogation confers no greater rights on the subrogee than the subrogor had at the time of the subrogation. Accordingly, the identity of a cause of action is not changed by the subrogation, and no new cause of action is created thereby.") (citation omitted). Based on the foregoing, the dissent's position that Acuity's claim for reimbursement of expenses related to what it contends was an unnecessary surgery performed by Dr. Ahuja is not subject to WIS. STAT. ch. 655 is misguided as this case clearly implicates ch. 655.

### 3. Acuity and Lynch do not have standing to bring a medical malpractice action in Wisconsin.

¶ 20. Dr. Ahuja challenges Acuity's and Lynch's standing to bring a medical malpractice claim in this matter. WISCONSIN STAT. § 655.007 specifies those who are eligible to make claims for medical malpractice. It provides:

**655.007 Patients' claims.** On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter.

The terms "patient" and "patient's representative" are defined as follows:

(10) "Patient" means an individual who received or should have received health care services from a health care provider or from an employee of a health care provider acting within the scope of his or her employment.

. . . .

(12) "Representative" means the personal representative, spouse, parent, guardian, attorney or other legal agent of a patient.

WIS. STAT. § 655.001(10), (12).

¶ 21. Acuity and Lynch do not fall within the definition of a patient or a representative. Despite distinguishable factual scenarios, recent opinions by our supreme court evidence a restrictive approach limiting the classification of claimants to those expressly referenced in WIS. STAT. § 655.007. *See Czapinski,* 236 Wis. 2d 316, ¶ 2 (refusing to broaden the classification of claimants under § 655.007 to include

323

adult children; instead, concluding that "[t]he classification of claimants entitled to bring a wrongful death suit for medical malpractice is limited to those enumerated in WIS. STAT. § 655.007"); *see also Lornson*, 302 Wis. 2d 519, ¶ 75 ("[I]n a medical malpractice wrongful death case, adult children of the deceased (like Lornson and Hoertsch) are not listed as eligible claimants and are therefore not eligible because of the exclusivity of WIS. STAT. § 655.007, as interpreted in *Czapinski*.").

¶ 22. Acuity and Lynch concede that they are neither patients nor patient's representatives; however, they seek to use this to their advantage by asserting that they necessarily fall outside the scope of WIS. STAT. ch. 655. In *Wisconsin Patients Compensation Fund v. Continental Casualty Co.*, 122 Wis. 2d 144, 150, 361 N.W.2d 666 (1985), the Wisconsin Patients Compensation Fund (Fund) made the same argument in trying to maintain a suit in the trial court rather than using ch. 655. The supreme court acknowledged that the Fund was neither a patient nor a patient's representative, but held that the intent of the legislature was to funnel *all* malpractice allegations into ch. 655 because that was the procedure set up to " 'protect health care providers and patients from the hazards of the traditional, lengthy tort litigation.' " *Wisconsin Patients Comp. Fund*, 122 Wis. 2d at 155 (citation omitted). Accordingly, Acuity's and Lynch's argument fails in this regard. We conclude that they lack standing to pursue this medical malpractice action.

 4. We decline the invitation to "equitably" consider Acuity and Lynch to be patients or patient's representatives.

¶ 23. In an alternative argument, Acuity asserts that if WIS. STAT. ch. 655 governs its claim, Acuity and

Lynch should "equitably" be considered patients or patient's representatives due to their subrogated rights. Other than citing case law to support basic subrogation principles, Acuity offers no case law to support its request.

¶ 24. This request that we somehow rewrite the statutory definitions of a patient or a representative to encompass Acuity and Lynch is not compelling at its most basic level. *See State v. Martin*, 162 Wis. 2d 883, 907, 470 N.W.2d 900 (1991) (court's task is to construe statutes, not rewrite them by judicial fiat). However, it is even less compelling when we are asked to rewrite a statute in a fashion that is at odds with the legislative intent behind it. *See Czapinski*, 236 Wis. 2d 316, ¶ 14 (detailing the reasons cited by the legislature for the creation of Wis. Stat. ch. 655 as the " 'sudden increase in the number of malpractice suits, in the size of awards, and in malpractice insurance premiums, and identif[y-ing] several impending dangers: increased health care costs, the prescription of elaborate defensive medical procedures, the unavailability of certain hazardous services and the possibility that physicians would cur-tail their practices' ") (citation and one set of internal quotation marks omitted). Due to their lack of standing to assert a medical malpractice claim, Acuity's and Lynch's action was appropriately dismissed.

 C. *The application of Wis. Stat. ch. 655 to bar Acuity's subrogation claim does not violate equal protection guarantees.*

¶ 25. Acuity challenges the constitutionality of Wis. Stat. ch. 655 as applied to it. Specifically, Acuity argues that applying ch. 655 to preclude it from seeking recourse results in disparate treatment. It writes: "Why should the plaintiff's doctor be protected and the tortfea-

sor punished when the doctor decides to recommend and render an unnecessary medical service? The classification of classes created by Dr. Ahuja's application of WIS. STAT. [c]h. 655 is unconstitutional." (Footnote omitted.)

■■■■

¶ 26. To succeed on its challenge, Acuity must show that WIS. STAT. ch. 655 is unconstitutional as it applies to it. *See Quintana*, 299 Wis. 2d 234, ¶ 19. Acuity has a difficult burden. "Statutes are presumed constitutional and the challenger bears the burden of proving the statute's unconstitutionality beyond a reasonable doubt. We indulge every presumption favoring constitutionality and if any doubt exists, it is resolved in favor of upholding the statute." *Id.* (citation omitted). If there is a reasonable basis for precluding Acuity from recovering on its subrogation claim, we will uphold the statutes as they apply to it. *See id.*

■■■■

¶ 27. Acuity does not claim the classification interferes with a fundamental right, nor does it claim a suspect class has been disadvantaged so as to require a review of WIS. STAT. ch. 655 with strict scrutiny. *See Quintana*, 299 Wis. 2d 234, ¶ 20. Consequently, "the appropriate analysis is whether the legislative classification rationally furthers a purpose identified by the legislature." *State v. Smet*, 2005 WI App 263, ¶ 21, 288 Wis. 2d 525, 709 N.W.2d 474. "Under this 'rational basis' test, equal protection is violated only if the classification rests upon grounds wholly irrelevant to the achievement of the state's objective." *Id.* "Equal protection does not deny a state the power to treat persons differently; rather, the state retains broad discretion to create classifications so long as the classifications have a reasonable basis." *Id.*, ¶ 26.

¶ 28. Acuity argues that there is "no rational reason why a physician is liable when it is his patient that makes the claim, but the physician is protected when it is the tortfeasor that pays for the surgery and makes the same claim. Liability should not be dependent upon who pays for the unnecessary surgery."[11] (Bolding in brief omitted.) Acuity further asserts:

> By not allowing Acuity and Lynch to pursue their subrogation claim against Dr. Ahuja, the legislature/court is not reducing litigation against doctors or reducing the cost of medical malpractice insurance. In a situation of unnecessary surgery, either Ms. Konkel makes the claim or Acuity and Lynch make the claim. The notion that somehow the subrogation claim versus the patient's claim for the same surgery would open the "flood gate" or create a "de facto launching pad" is irrational.

(Some uppercasing omitted.)

¶ 29. We are not convinced by Acuity's assessment relating to the anticipated non-effect of allowing its

---

[11] We are not persuaded that the reasoning set forth in *Funk v. Wollin Silo & Equipment, Inc.*, 148 Wis. 2d 59, 435 N.W.2d 244 (1989), on which Acuity relies, is analogous to the present circumstances. *Funk* addressed whether the classification scheme set forth in a statute of repose controlling the time period during which an action for injury resulting from improvements to real property must be brought violated equal-protection guarantees. *See id.* at 61. Acuity also relies on *Ferdon ex rel. Petrucelli*, where our supreme court invalidated the medical malpractice cap on noneconomic damages based on its conclusion that it violated equal protection guarantees. *Id.*, 284 Wis. 2d 573, ¶ 10. Although *Ferdon* arises under Wis. Stat. ch. 655, its holding, that the statutory cap was not rationally related to the legislative objectives behind the chapter's enactment, is not controlling on our resolution of the issue at hand. *See Ferdon*, 284 Wis. 2d 573, ¶¶ 184–87.

claim to proceed. Based on her affidavit, it appears Konkel has no desire to pursue a claim against Dr. Ahuja. We cannot reconcile how a holding that would allow Acuity to "step into her shoes" and pursue a claim that Konkel herself does not wish to pursue would *not* open the flood gate to similar lawsuits.

¶ 30. As set forth in *Strykowski*, the legislative rationale behind the creation of Wis. Stat. ch. 655 was as follows:

> The legislature cited a sudden increase in the number of malpractice suits, in the size of awards, and in malpractice insurance premiums, and identified several impending dangers: increased health care costs, the prescription of elaborate "defensive" medical procedures, the unavailability of certain hazardous services and the possibility that physicians would curtail their practices.

*Strykowski*, 81 Wis. 2d at 508. Here, the legislature's classification, which precludes Acuity, and other similarly situated parties, from pursuing subrogation claims against health care providers "is plainly germane to the act's purposes." *See id.* at 509. Accordingly, under the rational basis test, Acuity's equal protection argument fails.

*D. Public policy considerations support this resolution.*

¶ 31. Acuity argues that it is against public policy to allow physicians to engage in unnecessary medical care and then "charge it off" to alleged tortfeasors. Instead of working in Acuity's favor, however, we conclude that public policy considerations support a holding that precludes its subrogation claim.

328

¶ 32. We agree with Dr. Ahuja that if these claims are allowed to proceed, "virtually every personal injury case will involve an allegation that some of the care occasioned by the accident was malpractice and, therefore, not the responsibility of the tortfeasor." Aside from the almost certain influx of third-party subrogation claims that would result, we are further concerned about the effect of such claims on physician/patient relationships. Konkel's affidavit is in the record. In it, she states that she continues to receive treatment from Dr. Ahuja and has no complaints concerning the care and treatment he has provided her. She further indicates that she has "concerns that Dr. Ahuja's presence in this lawsuit as a party may interfere with [their] physician/patient relationship." Her concerns are legitimate. Should Acuity's claim be allowed to proceed to trial, presumably she will be called to testify regarding his treatment of her. The nature of her testimony could subject Dr. Ahuja to additional damage claims and strain their relationship.

¶ 33. Like the trial court, we conclude that allowing Acuity to proceed would " 'enter a field that has no sensible or just stopping point.' " *See Cole v. Hubanks,* 2004 WI 74, ¶ 8, 272 Wis. 2d 539, 681 N.W.2d 147 (citation omitted) (identifying six public policy considerations used to limit liability and further stating that "[a] determination that any one of the factors applies to the case at hand is sufficient to preclude liability"). If there are any perceived shortcomings in the statutes, and we do not conclude that there are, it is the legislature's function to address them. *See generally State ex rel. U.S. Fid. & Guar. Co. v. Smith,* 184 Wis. 309, 316, 199 N.W. 954 (1924).

329

¶ 34. For the reasons stated, we affirm the summary judgment order dismissing Acuity's action.[12]

*By the Court.*—Order affirmed.

¶ 35. FINE, J. (*concurring/dissenting*). The question in this case is whether Nancy Lynch and her insurer Acuity must, under *Hanson v. American Family Mutual Insurance Co.*, 2006 WI 97, 294 Wis. 2d 149, 716 N.W.2d 866, pay the allegedly unreasonable charges billed by Midwest Neurosurgical Associates, S.C., and Arvind Ahuja, M.D., for their treatment of Lisa Konkel, who was injured in an accident with Lynch. Although I agree with the Majority that WIS. STAT. ch. 655 governs Lynch's and Acuity's claim that they should be reimbursed by Midwest and Dr. Ahuja for Konkel's pain and suffering caused by any unnecessary procedures performed by Dr. Ahuja, *see Northwest Gen. Hosp. v. Yee*, 115 Wis. 2d 59, 62, 339 N.W.2d 583, 585 (1983) (claims for "bodily injury" are subject to ch. 655), I disagree with the Majority's conclusion that ch. 655 also governs Lynch's and Acuity's contention that they should not pay any unreasonable charges billed by Midwest and Dr. Ahuja.[1] Accordingly, I respectfully dissent in part.

---

[12] Because we affirm the dismissal of Acuity's claim, we need not address the remaining arguments presented by Dr. Ahuja. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to decide nondispositive issues).

[1] Lynch and Acuity do not argue that they may use WIS. STAT. ch. 655 to pursue their claims for money they paid for Konkel's pain-and-suffering caused by what they contend were Dr. Ahuja's unnecessary procedures. *But see Wisconsin Patients Compensation Fund v. Continental Cas. Co.*, 122 Wis. 2d 144, 156, 361 N.W.2d 666, 672 (1985) ("[T]he legislature intended that ch. 655 cover actions arising from medical malpractice claims brought by [non-patients] for either contribution or for

¶ 36. There is no doubt that if Lynch were a criminal ordered to reimburse a victim for his or her medical bills, Lynch could challenge the reasonableness of those bills. *See* WIS. STAT. § 973.20(3) ("If a crime considered at sentencing resulted in bodily injury, the restitution order may require that the defendant do one or more of the following: (a) Pay an amount equal to the cost of *necessary* medical and related professional services and devices relating to physical, psychiatric and psychological care and treatment.") (emphasis added). This is consistent with the well-established principle that all damages awarded must be reasonable. There is no reason why this rule does not apply here. If allowed to stand, the Majority opinion will make Lynch and Acuity pay bills that they assert they can prove are not reasonable.

¶ 37. *Yee* teaches that Lynch's and Acuity's challenge to the reasonableness of the medical expenses they are asked to pay is not subject to WIS. STAT. ch. 655. *Yee* held that ch. 655 did not govern a patient's claim against her physician to recover what she asserted were unnecessary charges billed to her by the hospital as a result of the physician's "unreasonable, unnecessary, and negligent" treatment. *Yee*, 115 Wis. 2d at 60–61, 339 N.W.2d at 584. The key was that the patient's claim did not arise "as a malpractice claim against the doctor" but, "[r]ather, it arose from a contract action" brought by the hospital against the patient. *Id.*, 115 Wis. 2d at 62, 66, 339 N.W.2d at 585, 587. By the same token, the claim asserted against Midwest and Dr. Ahuja by Lynch and Acuity did not arise as a malpractice claim but stems from the automobile accident involving Lynch and

payment of an insurer's proper share of damages" where "[t]he underlying factual issues . . . concern medical malpractice.") (Wisconsin Patients Compensation Fund as an excess insurer).

Konkol. Indeed, Lynch and Acuity are not asserting medical-malpractice claims against Midwest and Dr. Ahuja; rather, they object only to paying bills that they contend were inflated. As *Yee* held: "We find no indication that the legislature envisioned the patients compensation panel as a forum for patients and health care providers, such as Northwest General Hospital, to litigate the necessity, reasonableness, and propriety of a bill for medical care services." *Id.*, 115 Wis. 2d at 66, 339 N.W.2d at 587. I see no reason why this does not apply to Lynch and Acuity as well.

¶ 38. As the Majority notes, WIS. STAT. ch. 655 was enacted to hold down the cost of health-care. We may take judicial notice that run-away health-care expenses have wracked our society and the problem and its horrific ramifications for the uninsured and the under-insured are only getting worse. *See* WIS. STAT. RULE 902.01(2)(a), (3), (6) (A court may take judicial notice of any "fact generally known within the territorial jurisdiction" of the court, "whether requested or not," and "at any stage of the proceeding."). Making persons like Lynch and her insurer liable for unreasonable costs of medical care will only make things worse—those who have carte blanche to charge what they will, will charge what they want. This will exacerbate the health-care crisis and make those who buy insurance and, inevitably, the taxpayer pay ever burgeoning costs. Certainly, Konkel has no interest or incentive to ensure that the accident-related charges by Midwest and Dr. Ahuja are reasonable because she does not have to pay them. H.L. Mencken once observed, apparently borrowing from the 16th Century British writer John Lyly, that: "Conscience is the inner voice which warns us that somebody may be looking."

http://www.worldofquotes.com/topic/Conscience/index.html (last visited July 27, 2009). Without scrutiny by Lynch and Acuity *no one* is watching.